IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 14, 2011 Session

**STATE OF TENNESSEE v. LEJEANRA E. POLK**

**Appeal from the Circuit Court for Montgomery County**
**No. 40801092      Michael R. Jones, Judge**

---

**No. M2011-00226-CCA-R3-CD - Filed October 21, 2011**

---

On August 4, 2008, the Montgomery County grand jury charged the defendant, Lejeanra E. Polk and a co-defendant, Nicole T. Davis, with one count of premeditated first degree murder, *see* T.C.A. § 39-13-202(a)(1) (1991 and Supp. 1995), and one count of first degree felony murder, *see id.* § 39-13-202(a)(2), for the November 1995 stabbing death of Carolyn Vega-Velasquez.  Following a bench trial, the defendant was convicted of second degree murder and felony murder.  At sentencing, the trial court merged the second degree murder conviction into the felony murder conviction and imposed a life sentence by operation of law. *See id.* § 39-13-208(c).  The defendant challenges the sufficiency of the evidence on appeal. Discerning no infirmity in the evidence, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Stephanie D. Ritchie, Clarksville, Tennessee, for the appellant, Lejeanra E. Polk.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Helen Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In late November 1995, Vincent Scott Cavender, a veteran postal worker, became concerned when he delivered mail to the victim's overflowing mailbox.  He spoke to his postmaster, who recommended he attempt to deliver the mail to the victim's door. When Mr. Cavender did so but received no answer at the door, he decided to place the victim's mail inside her unlocked car.  The next day, November 30, he again noticed that the

mail had not been picked up from either the mailbox or the car, so Mr. Cavender asked Port Royal Park Ranger Mark Swan to check on the victim while Mr. Cavender completed his mail route. Ranger Swan went to the victim's home, where he saw someone lying on the living room floor. He immediately contacted the Montgomery County Sheriff's Department (MCSD). Mr. Cavender returned to the victim's home, where he also saw someone lying on the living room floor. MCSD deputies arrived, broke out a window to unlock a door, and entered the residence to discover the victim lying dead on her living room floor, the victim of an apparent stabbing.

MCSD Deputy Ray Johnson was serving warrants in the area when he received a call to perform a "welfare check" at the victim's home. When he arrived, Ranger Swan and Mr. Cavender were waiting at the victim's door. When Deputy Johnson looked inside, he observed "some legs laying on the floor" in the living room. Because all of the doors and windows to the home were locked, Deputy Johnson waited for emergency medical personnel to arrive with a "car jack" to break open a window. Deputy Johnson entered the residence first and observed the victim, who appeared to have been "dead for a few days." The victim was "tied with some type of cord." Deputy Johnson secured the scene to insure no one else was in the home. The victim's stereo was on, and the victim's bedroom appeared to have been rifled.

MCSD Sergeant Clifton Smith arrived to assist in the investigation. He recalled that it was "definitely noticeable that there had been an ongoing struggle throughout several of the rooms." He observed that the living room, home gym, stairway and master bedroom were "messed up," but otherwise the house was "very clean [and] very immaculate." The unkempt areas appeared as though "a robbery or a struggle or something had taken place." In the gym area, Sergeant Smith found broken window blinds, a broken glass candy dish, an electronic item missing from an entertainment center, and "vacant" spots in a cabinet that contained compact discs (CDs). In the master bedroom, he found the victim's purse dumped out on the floor, a turned-over lamp, and open drawers. He opined that "it was definitely obvious that something had been taken" from the home. Sergeant Smith also found a pan of brownies in the oven, an empty wine bottle in the garbage, and wine glasses in the dishwasher, as well as nail polish, make-up, marijuana, and rolling papers on the coffee table. He said that it appeared the victim had hosted "a girl party."

Sergeant Smith found the victim lying face up on a rug in the living room. Sergeant Smith determined that the victim had suffered "most definitely multiple stab wounds" as well as "blunt force trauma" to her head. The victim's hands were bound with a telephone cord. Investigators found a clump of hair on the stairway and another in the victim's hand. Sergeant Smith observed blood spatter in the gym area on the walls and floor. He also found blood spatter and smudges in the living room. Sergeant Smith believed a pair

of scissors found near the victim's body to be the weapon used to inflict the stab wounds. Sergeant Smith discovered no blood on the second floor of the home.

MCSD Sergeant Brian Prentice also investigated the victim's death. He discovered that the victim's cellular telephone was last used on November 19 and that the victim, a student at Austin Peay State University, failed to meet a study partner sometime around the same date. The victim's bank records showed that she withdrew $20 from the automated teller machine at 2:02 p.m. on November 19. Sergeant Prentice interviewed many of the victim's friends and associates to no avail. Fingerprint and deoxyribonucleic acid (DNA) evidence collected at the scene also failed to provide any leads in the investigation.

The case remained unsolved for almost 11 years until October 11, 2006, when officers from the Metropolitan Nashville Police Department notified MCSD that a woman, later identified as the defendant, came into their office wanting to discuss the Clarksville murder of "a Hispanic lady . . . [who] was tied up and left on the floor" of her home. Sergeant Prentice traveled to Nashville to interview the defendant, who did not want to sign a *Miranda* waiver or have any notes taken of the interview. The defendant, although "very anxious," willingly spoke with authorities and admitted that she and her cousin, Nicky Davis, were at the victim's home on the night of the victim's death. She told authorities that she frequented the victim's bathroom on many occasions throughout the night to smoke crack cocaine. During one such retreat to the bathroom, the defendant heard a "large commotion" and came out of the bathroom to find the victim on the floor with her hands tied. The victim asked the defendant for help, but the defendant ran to the car and waited for Ms. Davis to come outside because she claimed she was afraid of Ms. Davis. Ms. Davis came to the car with some of the victim's belongings, and the two then drove away.

In a recorded interview on January 25, 2007, in St. Petersburg, Florida, the defendant denied seeing the victim harmed in any way. She admitted that she had been at the victim's home that night, but she claimed that she had spent most of the evening in the bathroom smoking crack cocaine. The defendant also, at that time, denied talking to the authorities in October 2006.

Tennessee Bureau of Investigation Agent Colleen McEachen interviewed the defendant on April 25, 2008, at the defendant's home in Nashville. The defendant, who was "visibly upset" during the interview, told Agent McEachen about her history of mental illness and drug addiction. She admitted that she, Ms. Davis, and the victim were partying at the victim's home on the night of the victim's death. She said that when she was in the bathroom smoking crack cocaine she heard the victim and Ms. Davis arguing. The defendant claimed not to remember anything else about that night.

Agent McEachen reported that fingerprints taken from a glass vase at the victim's home matched those of Ms. Davis. Investigators found no other identifiable fingerprints. Clumps of hair found at the scene were from the victim. All blood evidence recovered from the scene matched the victim. A pair of scissors recovered near the victim's body revealed no blood evidence and were dismissed as a possible weapon.

Doctor Charles Harlan, the Consulting Forensic Pathologist for Montgomery County at the time of the victim's death, performed the autopsy of the victim. He determined that the victim "bled out" from 16 stab wounds to her chest and abdomen. He opined that the wounds were consistent with having been inflicted by a steak knife. Doctor Harlan also observed that the victim suffered blunt trauma to her head, evidencing that she had been "struck multiple times with a considerable amount of force." The autopsy showed ligature marks to the victim's wrists and a bite mark on her left arm. Doctor Harlan found contusions on the victim's neck consistent with strangulation as if "inflicted by the fingertips of someone applying pressure" to the victim's neck. Doctor Harlan could not determine whether the victim had been sprayed with mace due to the already progressing decomposition at the time the victim's body was discovered.

Nicole Davis, the defendant's cousin and co-defendant, testified at trial that she lived in Nashville in 1994 and 1995. She said that she met the victim through her cousin, the defendant. On the night of the victim's death, Ms. Davis and the defendant traveled from Nashville to the victim's home in Clarksville. On their way, the defendant told Ms. Davis, "We're going to my friend's house and we're going to rob her." At the victim's home, the three women first "had a couple drinks" and then left in the victim's car to buy marijuana and crack cocaine. They returned to the victim's home, where the victim smoked marijuana while the defendant and Ms. Davis took turns in the bathroom smoking crack cocaine. Ms. Davis then testified regarding the events leading to the victim's death:

> [O]nce all the crack was gone, we sat there in the living room and we smoked some of the marijuana with the [victim] and cigarettes and then we had some more of the champagne. I went in the kitchen and I cut me some brownies and we were just sitting there talking, listening to music and all of a sudden, [the defendant] pepper-spray[ed] the [victim] in the face and knocked [the victim] down to the floor and g[ot] on top of her and strangle[d] her for a while . . . . Then [the defendant] went into the kitchen and got a knife and went back in the living room and got on top of the [victim] and was stabbing her.

Ms. Davis admitted that she handed the defendant a telephone cord and assisted the

defendant with tying the victim's hands. The defendant then placed in a grocery bag the knife, her wine glass, and a wine bottle that she had touched. The defendant handed Ms. Davis another bag and directed her to collect some of the victim's CDs. The defendant did not touch the doors as they left the home, but she directed Ms. Davis to open and close the doors on the exit to their car. As they left the home, the defendant "wiped" the pepper spray bottle and threw it on the ground outside the door.

Ms. Davis testified that the defendant said, "[I]f you try to tell, you'll go to jail and I'll just go to a mental hospital." On their return trip to Nashville, the defendant stopped at a shopping center and disposed of the bag containing the knife, wine glass, and bottle in a dumpster. She also changed into clean clothes and abandoned her bloody clothing in the dumpster. The defendant then went to a crack cocaine dealer and traded the stolen items for drugs.

Ms. Davis did not telephone the police because she was afraid for her three children. She denied knowing that the defendant planned to assault or kill the victim. She testified that she thought they would just steal some of the victim's jewelry. Ms. Davis recalled that the defendant seemed to enjoy her assault of the victim, but Ms. Davis described it as "sickening." She did not recall any struggle occurring in the gym or master bedroom. She denied hitting the victim with the candy dish or glass vase. She did, however, recall picking up the vase at the defendant's direction and dropping it on the floor. She acknowledged that she did not stop the defendant's assault and just sat as the defendant repeatedly stabbed the victim. She explained, "I did what [the defendant] said, I was scared and she was yelling and I did what she said." Ms. Davis admitted, however, that she and the defendant had an "ongoing plan to get high" on the day of the victim's death.

Stephanie Brewer shared a jail pod area with both the defendant and Ms. Davis. During a conversation with Ms. Brewer, the defendant admitted stabbing the victim "[15] or [16] times." The defendant also told Ms. Brewer that she and Ms. Davis stole a radio and CDs from the victim's home. The defendant related that Ms. Davis went through the victim's home stealing things while the defendant occupied the victim with conversation. When Ms. Brewer met Ms. Davis some time later, Ms. Davis also told Ms. Brewer that as she was going through the victim's belongings, she heard an argument between the defendant and the victim. Ms. Davis told Ms. Brewer that she grabbed a knife and handed it to the defendant who then stabbed the victim. Ms. Davis admitted to Ms. Brewer that she also stabbed the victim and helped the defendant bind the victim's hands with telephone cord.

The defendant testified that, in 1989, she "almost had a nervous breakdown" causing her to be hospitalized for 30 days and diagnosed with manic depression. The defendant worked until 1994 when her mental health issues became more pronounced. She

said that her employer "set it up where [she] could get just unemployment," and, in June 1995, she began receiving social security disability payments. At the time of the victim's death in November 1995, the defendant still had approximately $4,000 of the $7,000 initial lump sum disability payment she had been awarded in June. She described her financial status at that time as "comfortable."

The defendant testified that she first met the victim in 1993 and that they became friends and spent time in each other's homes on numerous occasions. She recalled when the victim began construction of her new home, but in November 1995, the defendant had not seen the victim "in about six to nine months." On the morning of November 19, Ms. Davis visited the defendant at her home. When the defendant told Ms. Davis her plan to visit the victim in Clarksville later that afternoon, Ms. Davis asked if she could come along. Although Ms. Davis was acting "nervous and jittery" from having stayed out all night, the defendant agreed that Ms. Davis could accompany her on the visit. The two women left Nashville for Clarksville at approximately 1:00 in the afternoon. The defendant denied telling Ms. Davis on the way to Clarksville that she intended to rob the victim.

Once at the victim's home, the defendant realized that Ms. Davis was acting "peculiar" – so much so that it became apparent to the defendant that the victim did not like Ms. Davis. The defendant tried to convince the victim that Ms. Davis had never been to a home as nice as the victim's and that Ms. Davis was just admiring the victim's home. The defendant testified that she "wanted to show [Ms. Davis] another way of life" by introducing her to the victim. The three women talked for a while and then decided to go to Nashville to purchase marijuana. The victim drove and paid for the marijuana. When the defendant went inside the house where the marijuana was purchased, she remained inside for approximately 45 minutes smoking crack cocaine while the victim and Ms. Davis waited outside in the car. On the return trip to the victim's home, the defendant continued to smoke crack cocaine in the backseat of the victim's car. She claimed that the victim was unaware of her crack cocaine use.

When the women returned to the victim's home, they played music and drank wine while the defendant went into the bathroom intermittently to smoke more crack cocaine. She said that Ms. Davis was angry with her because the defendant would not share the crack cocaine. While in the bathroom, the defendant heard running and someone closing doors upstairs. She then opened the bathroom door to see Ms. Davis spraying mace in the victim's face. The defendant said that Ms. Davis then ran through the house acting "just crazy." The defendant was scared and went back into the bathroom. She tried to telephone 911, but the telephone would not work. After approximately 20 minutes, she ran from the bathroom, grabbed her purse, and went to her car where she discovered a plastic storage tote in her backseat that had not been there before. Within five minutes, Ms. Davis came to the car

carrying a plastic grocery bag. The defendant drove Ms. Davis back to Nashville and dropped her off at "these apartments where the dude sell[s] drugs." Ms. Davis took the storage tote and the plastic bag with her.

The defendant denied assisting Ms. Davis with the assault or robbery of the victim. She said she did not see any blood either at the victim's home or on Ms. Davis' clothing. She denied seeing a knife. She did not see Ms. Davis stab the victim. When the two women left the victim's home, the defendant assumed that the victim had only been sprayed with mace. She testified that she had no reason to rob the victim because she had money of her own from her recent social security disability settlement.

The defendant testified that she went to the police station in October 2006 because her family had "pushed her away" and she felt like people related to the victim were following her.[1] The defendant denied making a confession to Ms. Brewer while in jail and claimed, in fact, not to have ever met Ms. Brewer before seeing her testify at trial.

Based upon the evidence presented, the trial court found the defendant guilty in count one of second degree murder as a lesser included offense of first degree premeditated murder and of first degree felony murder in count two. At a subsequent sentencing hearing, the trial court merged the convictions and imposed an automatic life sentence. The defendant claims on appeal that the evidence is insufficient to support her conviction for felony murder. She argues that the evidence of any robbery emanated solely from the uncorroborated accomplice testimony of Ms. Davis. The State asks this court to dismiss the appeal due to the defendant's failure to file a timely notice of appeal. In the event we waive the timely filing of the notice of appeal, the State contends that the evidence of the robbery was sufficiently corroborated to support the defendant's conviction of felony murder.

The record reflects the trial court entered judgments on December 3, 2010. The defendant did not file a motion for new trial. She did, however, file a notice of appeal on January 10, 2011. Following the filing of the State's brief which noted the untimely filing, the defendant filed a motion seeking permission from this court to accept a late-filed notice of appeal. In her motion, the defendant cites to attorney inadvertence as an explanation of the late filing. Tennessee Rule of Appellate Procedure 4 requires the filing of a notice of appeal within thirty days of the entry of judgment or order denying a motion for new trial. Rule 4(a) provides that this court may waive the requirement of a timely filed notice of appeal when "such a waiver is in the interest of justice." *See* Tenn. R. App. P. 4(a). We determine that waiver of the timely filing is appropriate in this case. Accordingly, we now

---

[1] The defendant intimated that the victim's deceased husband's military associates may have been following her.

turn to the merits of the defendant's appellate claim.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Tennessee Code Annotated defines first degree murder, as is applicable in this case, as "[a] killing of another committed in the perpetration or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2).[2] The Code defines second degree murder as "[a] knowing killing of another." *Id*. § 39-13-210(a)(1). The Code further provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id*. §39-11-401(a).

The evidence in this case showed that the defendant and Ms. Davis went to the victim's home with the intent to rob the victim as part of their ongoing pursuit to "get high." The victim's otherwise immaculate home showed evidence of a struggle in the master

---

[2] The indictment in this case alleges a knowing or reckless killing committed in the perpetration of a robbery. The offense was committed, however, subsequent to the amendment of the felony murder statute that removed recklessness from the statute, effective July 15, 1995. As further provided in the amendment, "[n]o culpable mental state is required for conviction under [the felony murder statute] except the intent to commit the enumerated offenses or acts in [the statute]." T.C.A. § 39-13-202(b). Any reference to a culpable mental state in the indictment was surplusage and does not affect the validity of the indictment in this case. *See State v. Jones*, 953 S.W.2d 695, 700 (Tenn. Crim. App. 1996) (holding "an indictment is not fatal merely due to inclusion of unnecessary prolix or surplusage words").

bedroom, gym, and living room.  Bedroom drawers and the victim's purse appeared to have been rifled.  Both the defendant and Ms. Davis testified that items were taken from the victim's home and traded for drugs.  An officer's testimony about blank spaces and unhooked wires in the victim's entertainment center and media cabinet indicated a missing electronic component and CDs, corroborating the theft of these items.  The victim suffered trauma to her head and neck.  She bled to death as a result of 16 stab wounds to her chest and abdomen.  The defendant and Ms. Davis' blame-shifting testimony at trial is of no consequence to our analysis.  Both the defendant and Ms. Davis participated in the robbery and benefitted from its proceeds.  The victim died as a result.  The evidence supports the convictions in this case.  Accordingly, we affirm the judgment of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE